UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
RONALDO ALPINO and                  )
ILMA ALPINO,                        )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )   Civil No. 1:10-12040-PBS
                                    )
JPMORGAN CHASE BANK, NATIONAL       )
ASS'N                               )
                                    )
            Defendants.             )
                                    )
```

**MEMORANDUM AND ORDER**

April 21, 2011

Saris, U.S.D.J.

I. Introduction

This cases arises after the defendant's foreclosure of the plaintiffs' home. The plaintiffs have alleged the following: the defendant breached the duty of good faith and reasonable diligence inherent in every mortgage contract in Massachusetts (Count I); the defendant breached its contract with the United States under the Home Affordable Modification Program (Count II); the defendant violated Mass. Gen. L. c. 244, § 14, regarding the operation of a foreclosure sale (Count III); and the defendant intentionally inflicted emotional distress (Count IV).

On November 24, 2010, the case was removed to federal court on the basis of diversity and federal question jurisdiction, see

1

28 U.S.C. §§ 1331, 1332, the federal question being the defendant's alleged breach of the HAMP government contract. The defendant then filed a motion to dismiss. After considering the record, the Court **DENIES** the motion in part and **ALLOWS** the motion in part without prejudice to the filing of an amended complaint.

## II. Factual Background

**A) The Alpinos' Mortgage:**

The Court derives the following facts from the complaint ("Compl."). For the purposes of this motion to dismiss, the facts are taken to be true. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1941 (2009).

The Alpinos purchased their home in December of 2002. In early 2004, they refinanced their original mortgage loan with a new loan from Washington Mutual Bank, Federal Association ("Washington Mutual") in the amount of $366,000, secured by a first mortgage on their property. The loan is a 30 year, adjustable rate mortgage, which annually adjusts to 2.65% above the average of the prior 12 monthly yields of the one year United States Treasury Securities.

Like many Americans, when the economy began failing in 2008, the Alpinos had difficulty keeping up on their mortgage payments. Meanwhile in September 2008, Washington Mutual collapsed, and JPMorgan Chase Bank ("JPMorgan") became its successor in interest to a number of financial interests, including the Alpinos'

2

mortgage and refinancing loan.  The Alpinos contacted JPMorgan to see about adjusting their payments in order to avoid default. They "diligently provided JPMorgan with all the information requested" and "negotiated in good faith for a forbearance agreement, loan modification, or any other way to save their home from foreclosure." (Compl. ¶ 15.)  JPMorgan refused to modify, and when the Alpinos failed to stay current on their mortgage, the bank scheduled a foreclosure sale.

   Besides the failure to consider a mortgage payment modification, this action also concerns events occurring at the scheduled foreclosure sale.  The Alpinos allege that they arrived at their property around 4:15 pm on March 2, 2010 – fifteen minutes after the scheduled foreclosure auction was supposed to take place – and found a group of approximately twenty people. Mr. Alpino asked some of the people gathered whether the sale had already occurred.  He was told that it had not.  At that point he went inside the home to call a lawyer.  Ms. Alpino remained outside waiting for the auction.  After about ten minutes, all but two of the potential purchasers had left.  After several more minutes, these remaining two individuals had left as well. According to Ms. Alpino, at no time during this period did an auctioneer appear to fly an auction flag or hold an auction. Nonetheless, the defendant asserts that it conducted a sale and

that it "became the absolute title holder to the [Alpinos' home]." (Def. Mem. at 3.)

**B) The Home Affordable Modification Program (HAMP):**

In February 2009 the President announced the Homeowner Affordability and Stability Plan to help millions of Americans restructure their mortgages and stay in their homes in the face of impending default and foreclosure. (See Doc. 7, Ex. A ("Supp. Directive") at 1.) As part of that plan the government created the Home Affordable Modification Program (HAMP).

Among other things, HAMP creates a cost sharing system, whereby the government helps reduce the impact of mortgage modifications on lenders. In exchange, the program asks servicers to standardize and systemize a process for mortgage modification, including the implementation of the net present value (NPV) test. NPV compares the expected cash flow from a modified loan with the cash flow from the unmodified loan. If the expected cash flow from the modified loan exceeds the amount from the unmodified loan, then the loan servicer must modify the loan. Id. at 4. In considering a loan for modification, servicers must perform a "Standard Modification Waterfall." Id. at 8. This process requires servicers to apply a series of modification steps that work to reduce loan monthly payments to as close as possible to 31 percent of the homeowners gross monthly income. See generally Morris at 10 n.3.

Servicers opt into HAMP by executing Servicer Participation Agreements (SPAs). These agreements between servicers and Fannie Mae, in its capacity as a financial agent for the United States, require servicers to consider all eligible mortgage loans for modification unless prohibited by the rules of an application pooling and servicing agreement (PSA), which establish private label securitizations of mortgages. See id. at 1. But even in the face of PSAs that prohibit modification, "[p]articipating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out any modification under HAMP." Id.

Despite these provisions, homeowners have not always seen the benefits HAMP was intended to foster. During the first year of operation, HAMP resulted in the permanent modification of only 230,801 mortgages, well below the target objective of three to four million borrowers. See Jean Braucher, Humpty Dumpty and the Foreclosure Crisis: Lessons from the Lackluster First Year of the Home Affordable Modification Program (HAMP), 52 Ariz. L. Rev. 727, 739 (2010). In June 2010, the Government Accountability Office traced some of this underperformance to servicers' failure to adequately solicit HAMP eligible borrowers and to promptly respond to borrower inquiries regarding HAMP modifications. See U.S. Gov't Accountability Office, GAO-10-634, Troubled Asset Relief Program, Further Actions Needed to Fully and Equitably

Implement Foreclosure Mitigation Programs i (2010).

The defendant allegedly signed an SPA with the government and is a HAMP participant. (Comp. ¶ 19.)

### III. Standard

The plaintiffs' burden is to plead "sufficient matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). "A case has 'facial plausibility' when plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Id. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. In considering the adequacy of pleadings, a court must take as true the factual allegations in the plaintiff's pleadings and must make all reasonable inferences in favor of the plaintiff. Rivera v. Rhode Island, 402 F.3d 27, 33 (1st Cir. 2005).

### IV. Claims

Because it colors the resolution of the plaintiffs' state law claims, the Court begins by discussing Count II, the plaintiffs' claim for breach of the SPA between JPMorgan and the United States.

A) Count II

In order to bring a claim for breach of the SPA between the defendant and the United States Department of Treasury, the Alpinos must demonstrate that they are the third party beneficiaries of this agreement. See Speleos v. BAC Home Loans Servicing, 10-11503, 2010 WL 5174510, * 4 (D. Mass. Dec. 14, 2010)("Speleos"). Of the number of federal courts to have considered this issue, the majority have held that homeowners are not the intended beneficiaries of these agreements and, thus, do not have a claim for breach of contract arising from lenders or servicers' failures to abide by the terms of HAMP in considering inquiries related to mortgage modifications. See Speleos at * 3 (collecting cases). Only one court has held to the contrary. See Marques v. Wells Fargo Home Mortgage, Inc., 09-1985-L, 2010 WL 3212131 (S.D. Calif. Aug. 12, 2010) ("Marques").

In December, this court denied a homeowner third party beneficiary status under HAMP. See Speleos (Gorton, J.). Quoting at length from the HAMP guidelines and Treasury announcements explaining the program, the court held that the borrower could make out a "colorable" claim that HAMP was intended to benefit homeowners. Id. at *5. However, the court ultimately concluded that a finding that homeowners could sue for the breach of an SPA was not consistent with the terms of the contract, which stated that the rights and remedies outlined in the SPA were "for our

7

benefit and that of our successors and assigns." Id.

The court in Marques arrived at the opposite conclusion after highlighting the numerous requirements HAMP imposes on servicers with regard to their interactions with borrowers. For example, the court noted that the "agreement expressly provides that the '[s]ervicer shall perform the Services for all mortgage loans it services. . . .'" Marques at *5 (quoting SPA at § 2(A)). Thus, the court held: "The Agreement on its face expresses a clear intent to directly benefit the eligible borrowers.'" Marques at *6.

There is compelling evidence that the government intended to benefit homeowners when it implemented the HAMP program, and the contractual language highlighted by the court in Marques requiring servicers to consider all eligible mortgages for HAMP modifications is illustrative of this design. But on its own, this language merely stresses that servicers are required to perform these obligations, not that private parties necessarily have third party beneficiary status to enforce them. As the Supreme Court recently illuminated in reversing the Ninth Circuit's decision in Cnty. of Santa Clara v. Astra USA, Inc., 588 F.3d 1237 (9th Cir. 2009), rev'd, 131 S.Ct. 1342 (2011), the test for determining whether a plaintiff is a third party beneficiary to a government contract must focus on whether the contract intended to provide the plaintiff with a legal cause of

8

action, not just whether the plaintiff falls within a class of individuals that the contract and its underlying policies seek to benefit. See Astra USA, Inc. v. Santa Clara Cnty., 131 S.Ct. 1342, 1348 (2011)("The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity." (quoting 9 J. Murray, Corbin on Contracts §45.6, p. 92 (rev. ed. 2007)(internal quotation marks omitted)).

Guided by this principle, the Court adopts the reasoning in Speleos. Despite HAMP's general purpose to benefit homeowners, the SPA contains clear language limiting the class of actors who can enforce its terms. It states: "The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest." (See Pl. Ex. A ("SPA") at § 11(B).) In the face of this language, and the Supreme Court's recent holding in Astra, the Alpinos cannot demonstrate that they are the intended beneficiaries of the SPA. For this reason, Count II must be dismissed.

In dismissing Count II, the Court recognizes the difficulty homeowners have had in realizing the benefits of HAMP. HAMP enforcement tends to focus on servicers' responsibilities after a loan has been modified and seek to protect "the Treasury for overpaying [incentives]." Marques at * 6. There has been little

9

enforcement of the requirement that servicers consider eligible loans for modification.  One recent article has noted that part of the problem Treasury has had in encouraging HAMP compliance may lie in the conflict between the incentives of loan servicers and mortgage loan holders.  Servicers, who often administer mortgage loans that have been packaged and sold off to third-party holders in complicated securities instruments, will sometimes see greater returns from a foreclosure than a modification, even if the modification increases cash flows to mortgage holders. <u>See</u>, Adam J. Levitin & Tara Twomey, <u>Mortgage Servicing</u>, 28 Yale J. on Reg. 1 (2011).

This does not mean that homeowners like the Alpinos are without a means of redress.  Even though the Alpinos cannot bring a claim directly for breach of the SPA agreement, the defendant's failure to abide by HAMP's terms may give rise to other causes of action under state law.  Specifically, as this Court held in <u>Morris</u>, the Alpinos may have a cause of action under Mass. Gen. L. ch. 93A, the Consumer Protection Act, for the defendant's failure to consider them for a HAMP modification, as long as they can show that this failure was deceptive or unfair under § 93A. <u>See</u> <u>Morris</u> at 7-8; <u>see also</u> <u>Bosque v. Wells Fargo Bank, N.A.</u>, No. 10-10311, 2011 WL 304725, at *7-*8 (D. Mass. Jan. 26, 2011) (denying motion to dismiss Chapter 93A claim arising out of HAMP application).  They may also be able to allege that the

defendant's failures amounted to negligence, for HAMP affects the mortgage lender's legal duties. Speleos at *6 (stating, with regard to HAMP, that a "claim for negligence based on a statutory or regulatory violation can survive even where there is no private cause of action under that statute or regulation."). In other words, even if the Alpinos do not have a federal cause of action under HAMP, some violations of HAMP may form the basis of state law causes of action. Count II is dismissed without prejudice.

    B) Counts I and III

The Alpinos also allege that the defendant breached its "duty of good faith and reasonable diligence." This claim does not concern HAMP or the SPA; rather, it posits the violation of independent state-law duties inherent in every mortgage contract in Massachusetts. Along with this claim, in Count III, the Alpinos allege that the defendant violated the Massachusetts foreclosure statute by failing to conduct an open public auction under the mortgage's power of sale. See Mass. Gen. L. c. 244 § 14.

In Massachusetts "the basic rule of law applicable to the foreclosure of real estate mortgages is that 'a mortgagee in exercising a power of sale in a mortgage must act in good faith and must use reasonable diligence to protect the interests of the mortgagor.'" Seppala & Aho Const. Co., Inc. v. Petersen, 373

11

Mass. 316, 367 N.E.2d 613, 616 (Mass 1977)(citations omitted). Technical compliance with the rules governing the foreclosure procedure does not necessarily ensure that a mortgagee has met its obligations under the law. If the mortgagee does not exercise good faith in the execution of a foreclosure, then the foreclosure sale is invalid. See <u>Edry v. Rhode Island Hospital Trust Bank</u>, 201 B.R. 604, 607 (Bankr. D. Mass. 1996) (finding that a mortgagee's failure to make reasonable efforts to sell the property for the highest value possible invalidated a foreclosure sale). "[T]his responsibility is [even] 'more exacting' where the mortgage holder becomes the buyer at the foreclosure sale. . . ." <u>U.S. Nat. Bank Ass'n v. Ibanez</u>, 458 Mass. 637, 941 N.E.2d 40, 50 n. 16 (citations omitted).

Here, the Alpinos press two different theories of liability under Count I. First, they allege that the defendant breached its duties by failing to consider the Alpinos for a mortgage modification. Second, they argue that the defendant's alleged failure to hold the auction in a reasonable manner is a violation of the inherent duty of good faith and reasonable diligence.

The Court need not address the first theory of liability, for it finds that the Alpinos have alleged sufficient facts to surpass a motion to dismiss on their second theory. In claims for a breach of the duty of good faith and reasonable diligence, Massachusetts courts have placed emphasis on a mortgagee's duty

to protect the mortgagor's interests by seeking a reasonable foreclosure price and ensuring that the mortgagor has notice of the sale. For example, in <u>Bon v. Graves</u>, 216 Mass. 440, 130 N.E. 1023 (1914), the Supreme Judicial Court held that the fact that a mortgagee gave notice of a foreclosure sale in publications of limited circulation, along with the mortgagee's failure to provide the mortgagor with personal notice of the sale, amounted to a breach of its duties under state law. <u>Id.</u> at 1026 ("The duty of one acting under a power of sale in a mortgage is to use that reasonable degree of effort and diligence to secure and protect the interests of the mortgagor, the owner of the equity of redemption and junior lienors, to the observance of which he is bound by the obligation in good faith.").

Here, the Alpinos have alleged sufficient facts to raise a plausible claim that the defendant failed to make reasonable efforts to protect the Alpinos' interests by conducting a fair and open foreclosure sale. See <u>Aurea Aspasia Corp. v. Crosby</u>, 331 Mass. 515, 120 N.E.2d 759, 760-61 (Mass. 1954)(finding that the appearance of an auctioneer, who announced the terms of the sale, and flew a red flag was sufficient to conclude that a foreclosure action had occurred). This would implicate the defendant's duty to protect the plaintiff's interests by securing the highest possible price in the foreclosure sale and its duty to ensure that the homeowner had adequate notice of the auction, a duty

that is heightened in this case because the defendant allegedly purchased the property at issue.

The plaintiffs have also alleged sufficient facts to establish that the defendant may have violated the Massachusetts foreclosure statute. Mass. Gen. L. c. 244, § 14 addresses a mortgagee's "foreclosure under power of sale." Id. Among other things, this section assumes the conducting of a public auction. See id. (providing a model form for the "Mortgagee's Sale of Real Estate," which includes specific mention of a "Public Auction" and leaves space for the time, date, and location of the auction.). If the defendant indeed failed to hold a public auction at the time and date noticed, then it violated both the letter and the spirit of the provision.

The fact that the foreclosure sale may not have been properly conducted does not necessarily mean that the Alpinos have asserted valid claims for relief. The plaintiffs allege that the defendant's actions entitle them to, among other things, the issuance of a preliminary injunction preventing their eviction, a preliminary injunction preventing JPMorgan from selling the property, the granting of "unclouded title" in the property, reasonable damages, and a lis pendens. At a hearing before this Court, the plaintiffs stated that they were also seeking rescission of the mortgage contract. The defendant argues that the only cause of action available to the Alpinos is

one in equity for redemption of the mortgage and seeks to dismiss Counts I and III because the Alpinos have not explicitly made a claim for redemption.

Massachusetts law recognizes two different types of actions that can be brought by a mortgagor alleging that his property has been transferred in a wrongful foreclosure sale: "[a]n action of tort, and a proceeding to set aside the foreclosure." <u>Cambridge Sav. Bank v. Cronin</u>, 289 Mass. 379, 194 N.E. 289, 290 (Mass. 1935). The plaintiffs appear not to be pursuing a tort claim, for such a claim would be inconsistent with their stated desire to retain title to their home. <u>See</u> <u>Rogers v. Barnes</u>, 169 Mass. 179, 47 N.E. 602, 604 (Mass. 1897) (explaining that in cases where the plaintiff successfully brings an action in tort for wrongful foreclosure, which is similar to an action for conversion of personal property, the plaintiff surrenders legal title to the property at issue). Instead, the Court understands them to be seeking an invalidation of the foreclosure sale. Historically, this type of claim was styled as a "bill to set aside the foreclosure and redeem." <u>See</u> <u>Cambridge Savings Bank</u>, 194 N.E. at 290. Nowhere in their complaint do the Alpinos explicitly state their intent to exercise their right of redemption. But, even assuming that this is the only form of relief available, a failure to explicitly seek a right of redemption does not require dismissal of a claim for equitable

15

relief from an allegedly invalid foreclosure sale. Cf. <u>State Realty Co. of Boston v. MacNeil Bros., Co.</u>, 334 Mass. 294, 135 N.E.2d 291, 294-95 (Mass. 1956)(finding that there "was no error in overruling the demurrer of" the mortgagee in a suit for redemption where the "bill for redemption [was] somewhat inartifically drawn" but identified the "mortgage and the parties interested in it, allege[d] that the mortgage is upon property of the plaintiff, and offer[ed] redeem."). A determination that the foreclosure sale was unlawful will void the sale and return the plaintiffs to the position they were in before the sale allegedly occurred.. See <u>Ibanez</u>, 941 N.E.2d at 50 ("[O]ne who sells under a power of sale must follow strictly its terms. If he fails to do so there is no valid execution of the power, and the sale is wholly void." (internal quotation marks and citations omitted)); <u>see also</u> <u>Rogers v. Barnes</u>, 169 Mass. 179, 47 N.E. 602, 603 (Mass. 1897)(noting that a wrongful foreclosure sale gives rise to a "cloud upon the title of the plaintiff to an equity of redemption in the premises, which cannot be removed without some expense to the plaintiff, and the damages might be more than nominal.").

    <u>D) Count IV: Intentional Infliction of Emotional Distress</u>:

As explained by the First Circuit, "[u]nder Massachusetts law, an individual is liable for intentional infliction of emotional distress when he, 'by extreme and outrageous conduct and without privilege, causes severe emotional distress to

another.' " <u>Limone v. U.S.</u>, 579 F.3d 79, 91 (1st Cir. 2009) (quoting <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 355 N.E.2d 315, 318 (1976)).

Though the defendant may have engaged in some legally cognizable wrongdoing, and though the Alpinos may have suffered greatly, there is no indication that the defendant's actions were extreme and outrageous. "The usage of the terms outrageous and extreme have become commonplace in today's society, however, as used by the <u>Agis</u> Court they mean more than 'annoyances, or even threats and petty oppressions.'" <u>Harvard Univ. v. Goldstein</u>, No. 961020, 2000 WL 282537, * 2 (Mass. Super. Ct. Feb. 15, 2000) (quoting <u>Conway v. Smerling</u>, 635 N.E.2d 268, 273 (1994)). The plaintiffs have not alleged that the defendant ever asked for more money than they actually owed on the mortgage, <u>see</u> <u>Beecy v. Pucciarelli</u>, 387 Mass. 589, 441 N.E.2d 1035, 1045 (D. Mass. 1982)(finding that attorney's negligent actions in bringing a collection action against the wrong defendant did not constitute extreme and outrageous conduct), nor do they claim that they have been removed from their home in the wake of the wrongful foreclosure. At most, the defendant failed to consider the plaintiff for a mortgage modification under HAMP and then failed to operate an open and fair foreclosure sale. The Alpinos claim for intentional infliction of emotional distress is dismissed.

ORDER

The Court **ALLOWS** the motion to dismiss Count II and Count IV.  The Court **ALLOWS** the request for a lis pendens.  The Court **DENIES** the motion to dismiss the remaining counts.

 PATTI B. SARIS
PATTI B. SARIS
United States District Judge